Thank you, counsel. Case is submitted. Counselor excused. We'll turn to our latest oral argument of the day. Oh, good. I was wondering if there were any attorneys to argue this case. It always helps. Me. So this is 22-4056, Microsoft v. Premera Blue Cross. Ms. Payton. If it please the court, Gwendolyn Payton on behalf, arguing today of Premera Blue Cross, Microsoft and the Microsoft Health Plan. This is a case about a claim of a member of an ERISA health plan who sought benefits for a stay at a residential treatment center. And the member asserted three claims, a claim for benefits under ERISA, a claim for violation of the Parity Act, and finally a claim under ERISA that the plan had not produced plan documents to her during the administrative proceeding. I want to first talk about the standing issue that the court has raised, then the Parity Act, and conclude with the statutory damages issue. Now, the district court here concluded that the members were not entitled to any benefits under ERISA at all. But despite this, the court went on to adjudicate the Parity Act claim and found a violation because the defendants used the inter-qual criteria when analyzing residential treatment, but not another service hospice. And because there was no entitlement under the plan to any benefits, the plaintiffs were not entitled to any remedy at all for that Parity Act violation. And as a preliminary matter, the district court conclusion that the plaintiffs were not entitled to any benefit at all under the plan deprived the district court of Article III jurisdiction to adjudicate the Parity Claim. To have standing, a plaintiff must have injury in fact caused by the defendant, and that injury must be redressable by the district court. You're not suggesting that the denial of benefits is an element of the Parity Act claim, are you? No, it is not an element of the Parity Act claim, but the Parity Act claim requires the claimant to be entitled to a remedy under the plan. And there was no entitlement to a claim under the plan here, so there's no standing to bring that Parity Act. Because of those requirements, you have to have an injury in fact. Is the Parity Act claim, in your view here, a facial claim or an as-applied claim? It is an as-applied claim. So you don't see that this was pled in the alternative, or there's nothing about this in your view, or you tell me. Is there anything about the member's Parity Act claim that could be construed as a facial? No, I mean here what the claimant is saying is that when you're evaluating medical necessity of my claim, you're using a more stringent requirement than you are when you are evaluating hospice claims. And that is an as-applied claim. There's no allegation here of any facial claim at all. And there's none in the complaint, and plaintiffs never made any argument as such. And I believe you'll find language to that effect in their briefing, that they are making an as-applied claim. So this court, because there is no injury in fact, should remand to the district court with direction to vacate the decision that came out in August of 2021 to the extent that there is Parity Act discussion in that decision. I want to turn to the merits of the claim. Let me ask you a little bit more about the claim. What provision of the statute was plaintiff relying on to seek this relief? Was it under, let's see, 1132A3? I think that's right, Your Honor. For an injunction. They were seeking an injunction. Right. Yes, and they're only entitled to equitable relief under the Parity Act. That's all that is available. Okay. Now, I'm not sure that we even need to address standing for that if they're just not entitled to injunctive relief under general equitable principles. If you're not injured by anything, can you seek an injunction under the Act? The answer is no, and that's actually what the district court finds. Where the standing issue and why it's relevant here also is because the district court should not be making law, case law, about an issue for which the plaintiff does not have standing. It's an advisory opinion. There is nothing justiciable in front of the court. I'm trying to see if we can avoid, maybe we can't, the Article 3 issue simply because under general equity principles, a person in the plaintiff's position wouldn't be able to bring a claim for injunctive relief. I think it would be defensible for the district court to have issued an order saying, you made a parity, you have no entitlement to benefits under this plan. You made a claim under the Parity Act. Under no scenario would you ever be entitled to relief or an injunction under that Act, so I'm not going to adjudicate the merits of that claim. You could look at it as there is no remedy, therefore the claim fails. That's an inextricably important part of the elements of the claim, or you could do an Article 3 standing analysis and you would come to the same conclusion. They both lead to the same thing. You can make the decision on either grounds and it is essentially the same. It comes to this basic principle that I don't think anyone can deny, is if you do not have a claim or controversy, there is no reason to adjudicate the merits of the claim. The district court should not have done that. The only error that the district court made was in making that finding about hospice being analogous. Then the district court was correct in the second order saying there is nothing to be done about this because there is no remedy available. I'm having a little trouble understanding though because of the other two claims where you're just seeking what the plan says. The plaintiff has no claim with respect to those issues regarding the plan, but we have lots of statutes allowing you to sue to get information, the Freedom of Information Act of course. I'm not sure why she lacks standing as opposed to lacks an equitable claim. When she first brings the claim, she has standing. Then she loses it during the course of the proceeding, which is a concept that the courts recognize. She always has standing on the third claim though, just so we're clear. Because? Because under ERISA, she has an independent right to seek information under the plan. We are not arguing to you that she lacks standing for the statutory claims. If she's entitled to information about the plan, why is she not entitled to have the court declare what the proper information should be in the plan? Someone in that condition or alleged condition could get relief, could get a different standard of review. They're totally separate claims. I realize that. I'm trying to see why one is a standing issue or a mootness issue and the other isn't. Because there's an independent right under ERISA. Congress has said, you have a claim here as an ERISA member to come into court and make this claim that you didn't get information you need under the plan. What there isn't here is if you don't have a right to a benefit under the plan, that you have a right to address a Parity Act violation. The right to the information. A participant has a right to enjoin any act or practice which violates any provision of this subchapter. On its face, it doesn't require you to have an interest in that specific provision. Why is that a right that's granted by statute? Why is that not a right granted by statute, but the informational claim is one granted by statute? Because of the congressional intent in ERISA. Because Congress says, we will allow you to bring a claim for denial of information under your plan, separate and in part from an entitlement to benefits. And that is different to say, my plan design violated the Parity Act. And that harmed me in a certain way. And you can see that when Congress says, you only get equitable relief under the Parity Act claim. And those two things, the entitlement to benefits and the right to be harmed. You have to have a claim to get the equitable relief under A3. You have to be harmed by the Parity Act violation in order to have standing to allege the Parity Act violation. It would make no sense, Your Honor, if I could come in and say, you know, I saw this plan. I don't have a mental health claim. But I just think X, Y, Z. I think you're right. But I think that's under equitable principles about who can seek conjunctive relief. I'm having, you may be totally right. I'm just totally wrong and confused. But on its face, A3 says you can bring a suit for this. So another provision says you can sue to get information. And you're saying, well, Congress said you can sue for information, so she has standing. Well, it says she can sue for injunctive relief, so she has standing. Article 3, standing. Go ahead. I don't think you'll find any Parity Act claim that is this type of advisory opinion, where somebody in any support in the statute or the case law anywhere that says, I just as, you know, an interested member of the public who cares about mental health issues, I don't have a claim under this plan. I may not even be a plan member. I'm going to somehow sort of adjudicate this in the raw, right, because it has to be tied to an actual injury that the plaintiff has alleged. And that's really clear in the case law. And then you have a separate provision that says when you have an erisa plan and somebody asks you for something, you need to give it to them. And that's where the injury happens, right, is she alleges you didn't give it to me and I'm entitled to statutory damages. They're two totally separate harms. In both of those claims, the plaintiff has been harmed, right? That plaintiff needs to be harmed. In the benefits and the Parity Act claim, she needs to say that I was entitled to the benefits and you didn't give them to me. Your Parity violation harmed me. I mean, it might be a de minimis violation. It might be something that really isn't even justiciable. It might be a whole variety of things. You need to tie it to the injury. You have a totally separate provision over here that says I'm entitled and I have a claim for benefits. You didn't give it to me. There's the standing. She has injury. So they're separate. I'm taking too much of your time. Let me clarify. The district court did say there was no standing for the injunctive relief claim, right? No. On the Parity Act? No. Okay. That's the problem. The district court said she is standing to raise the merits of the claim, right? So the Parity Act has three steps. You've got to show that there's something that is a restriction in the plan. You have to show an analog to a mental health medical, and then finally that there's some kind of disparity between them. And so he went ahead and adjudicated the second and the third element, but then says, but there's nothing I can do about it, because you've never had any rights under this plan anyway. And without rights under the plan, you haven't been harmed by the claim. And that decision was right. But what was not right was the adjudication of the merits of the claim for which the plaintiff would never have any relief to be afforded. And it's just such a fundamental premise that when we adjudicate claims under ERISA, they have to actually lead to some kind of benefit to the plaintiff, and the plaintiff has to have been harmed by it. Not for injunctive relief, though. But for injunctive or monetary relief. Because what he's saying is, change the plan for me. What he's saying is, get the interqual criteria out of my adjudication of my claim for mental health parity. So what the relief that the plaintiff asked for here was, adjudicate my claim again without interqual. And in fact, the district court did that. And so the relief here, and the plaintiff said, we're not seeking to change the plan for everybody. We can't. We don't have. And the plaintiff concedes, I don't have standing for that. This isn't a class action. But what this has to do with is, my claim has to be adjudicated without the parity violation. Well, if the claim was never there to begin with, you cannot give that injunctive relief. And that is a really important thing under the Parity Act, is that the remedies that the courts will give for Parity Act violations are always tied to the individual claim. Okay. I am going to pursue this a little more. A2 allows suits for injunctive and equitable relief by a participant, beneficiary, or fiduciary. Now, when is the fiduciary going to bring it? The fiduciary isn't going to have any loss. The fiduciary just wants the plan to comply with the law. So the fiduciary can bring a claim and say, what you're doing doesn't comply with the. But a fiduciary isn't an uninterested person. A fiduciary is somebody who has an obligation under the law to make sure that plan complies. Okay. So this same claim could have been brought by a fiduciary. You know, I'm not super familiar with what standing fiduciaries have under ERISA. But I will tell you just from common sense, we know that fiduciaries not only have an interest, they have an obligation to act in the interest of the plan. But if a fiduciary can bring this and Congress says we're also going to let a participant or beneficiary bring this, I'm confused about whether there would be an Article III problem then. The rights and obligations of fiduciaries under ERISA is a whole body of law that is a complete morass that, I mean, I don't have time to argue today, nor could I. You wouldn't understand today. Nor could I. But I will tell you this. We are focused on the rights of beneficiaries, right? And that is all that is at issue in this claim. And there is no doubt that a beneficiary is entitled to relief under the Parity Act for something that didn't hurt her. She has no claim, she has no standing, and she has no remedy. So however this court wants to spin it, you can say there was no Article III standing, you would be right. You could say there was never any remedy available so she couldn't bring the claim, and you shouldn't be adjudicating a claim for which there is no remedy, and you know that at the beginning as a matter of law. You can say it that way, and you'll be right. Why don't we cut that off? You're out of time, but let's now hear your argument on the other issues. Is that okay with you? Are you going to be patient with me to let that happen? Very good, thank you. No, let's hear you argue. Oh, okay, sorry. I'll be brief. Look, hospice is not analogous to residential treatment centers. And we talked about what is required. You've got to have an analog. Hospice is for terminally ill patients who are at the end of life. It's not to cure them, but it's to give them peace and comfort as they die. Residential treatment centers are facilities intended to get children back into the community as quickly as possible. Hospice is a type of service that you give, and you can give it all sorts of places. You can do it in the home. You can do it in a skilled nursing facility. You can do it in a hospital. You can do it in a hospice care center. Residential treatment centers are facilities. They just cannot be in the same category to be compared. The regulators have gone ahead and identified the analogs, and they are skilled nursing, and they are rehabilitative. And, yes, it's not exhaustive lifts, but those regulators knew well and good about hospice, and they didn't put it in the regulation. We don't need to over-engineer that. There is no case that has found hospice to be an analog. But it doesn't matter that it's not in the regulation, does it? Or does it? It does matter. Why does it matter? It's a non-exclusive list. It's examples. It's very, though, informative of the regulator thinking about this exact issue, giving some very clear guidance, and that stayed for a long time. And you see the courts dealing with hospice. None of them come to hospice. The regulator hasn't come forward and said hospice. It does give us information about two things, what the understanding of the regulator is of the intent of the statute. And if they had thought it was hospice, we know they would have put it because they thought hard about that. And, two, what the regulated entity is understanding and trying to comply. And there's no doubt that this plan is definitely trying to comply and didn't even consider hospice to be an analog because it was never raised before. When you really look at that summary plan description, you can see a lot of language in the actual plan putting restriction on hospice and talking about how it can be in many places. You have to be terminally ill. You need a doctor to say that. You have to have an interdisciplinary team taking care of the dying person. And it's very stark contrast to when we're taking a child out of the community 24-7 and keeping that child from the normal things that an adolescent needs, school, home, family. And those are very different types of services. And that's why over and over the medical literature, the courts and the requirements say that it is only recommended to put children in residential treatment where they cannot be safely managed in the community and they cannot be treated, though, effectively in the hospital or they don't need to be in the hospital. And we want to keep them at the right level of care. And the public policy for this is so obvious. We do not want to put restrictions on terminally ill people getting hospice. And we do want to be very careful about over-treating or over-restricting children into lockdown facilities. But even if you are assuming that these are analogous, there is absolutely no evidence in this record that there was any more restriction on residential treatment. Like I said, both require the doctor. I mean, the restriction on hospice is the ultimate restriction. You've got to be about to die. And there just is no evidence or support for these being analogous. Counsel, with my colleague's permission, I'm really interested in your disclosure claim and the member's disclosure claim. I move on. And you're close to being out of time, so if you could speak to that. Yes. Okay, so there are two things here, the administrative service agreement and the medical policies for skilled nursing and rehabilitation. Counsel, is the administration of the plan divided? It is not. It is not. It is not divided. In what way is it not divided, and what is the best evidence of that in this record? The summary plan description is the best evidence, and that is the document that the members look at to understand, what do I have here, what do I have to do? Actually, let me ask you a threshold question. What does it mean for the plan to be divided? The divided would be like in an insured plan where the administrator is also the insurer, or sometimes they'll split the duties. That's the case in the district court I'm sorry. So is Microsoft here the plan administrator and Primera is the claims administrator? Well, they're both the plan administrator. Primera is the plan administrator? Yes. So what Microsoft did is delegate the administration under ERISA to Primera, and Primera does it all. The delegation does not mean the plan is divided? The delegation does not mean the plan is divided. What is the authority for that? What is the authority for that? I think when you look at all of those cases that talk about whether or not the administrative service agreement is a plan document that needs- Well, that's a later question. I think the threshold question- They talk about that issue though. They do talk about the issue- Yeah, they do talk about that issue. Of why having the delegation of claims administration- Yeah, not all of them. Not make it a divided plan? Yeah, and they look at it this way. Isn't that a factual question? Why would we be looking at cases for that? It's uncontested here. The entire administration of this claim was done by Primera, and this is the important thing that the courts look at. Is there any information in the contract between the administrator and the plan that is not available to the plan member where they would expect it to be, which is the summary plan description, which the plaintiffs had here. There is no allegation here that there's anything in that contract between Microsoft and Primera that isn't fully explained to the member in the summary plan description. Every single court that has looked at it has said, that's not a plan document then that needs to be disclosed. How is Maundry different? Maundry was a split delegation case where the court found there was something in that document that was nowhere else that you couldn't find if you were a member. I didn't read that in Maundry. I'm very confused by that. What was in that document that couldn't be found anywhere else? The whole split delegation. I didn't see that being the basis for Maundry at all. Maundry looked at the language of the statute, which you're not doing here. The only thing we're being asked to do is to look at the language of the disclosure statute. What does it say must be disclosed? It says you must disclose, and then it lists various things. Then it says, a contract or other instrument under which the plan is established or operated. Maundry said this is a contract under which the plan is operated. They both have their responsibilities, just as they do here. There's a division of responsibilities. That's just basically what it said. It looked at the language of the statute. They didn't say, gee, is it in the summary plan description or isn't it? If it is in the summary plan description, you don't have to disclose it, because that's not what the statute says. In Maundry, the plan was also an insurance company itself, and it was keeping a lot of the administration of the claims itself and doing it itself. What difference does that make? The statute doesn't say anything about, gee, if there's another document that might explain to the member how this all works, and we don't have to give you this one. It tells you what you have to disclose. I didn't see that in Maundry at all. In Maundry, there was no other document that told plan members the way that plan was constructed. So what? Why does that matter under the statute? It matters under the statute, because the statute's requiring the plan to give full information in all of the relevant documents for the administrative of the plan to the member. Not every document that might be out there. But it's a contract. Why isn't the statutory language says contract or instrument? This is a contract between Microsoft and Primera. How is that not exactly what the statute contemplates would be of interest to members to learn about their rights under the plan? Because the statute is about the contract between the member and the plan, not about vendors who may do something else. That contract is primarily about how Microsoft will compensate Primera for the work that it is doing. It contains no information for plan members about what they need to do, what rights they have, where they need to go, who needs to do it. All of the things are in the summary plan description that a member needs. So you're saying that the way that we must read the word contract in the applicable statute is it's a contract between the administrator and the beneficiary? That's the only kind of contract that's at issue? It is. That's not what the statute says, so I'm trying to understand what the basis for your argument is. The statute says organizing documents, and it's not an organizing document under which the member receives rights. It is a separate side thing between two companies that are trying to give this service. The cases that adopt your view, do it under the justum generis canon of construction. Every other document that has to be disclosed that's mentioned in the statute is of the type that tells members what their rights are. So the courts have interpreted the more general language to be restricted to documents like those that come before. So I'm not sure, certainly if you took the word contract on its own, it would be very broad and all these would be considered. Any contract? Any contract that repeats some information or has something to do with ERISA? The key is what they do. Right. We know what they want. They want you to give the information that these people need to adjudicate their claims in all of it, and you can't hide some in some contract and say, well that's not a planned document. So what you need to do is give them the full panoply of the ERISA plan, and that happened here. And that is why the courts cut it off at the contract about how much I pay you to do certain services between these two companies. That is not a contract between the member and the plan. That is a separate inside thing. And what's important here is that you have a member who had everything. And there is no argument that this summary plan description was infirm in any way, that the organic plan documents were not produced. Only this administrative service agreement. And we would create a circuit split if we went the other way on this. We would be the only circuit that is so holding. And it doesn't help anything. And it's inconsistent with the intent of Congress about trying to streamline this process. Well, the intent of Congress is to give beneficiaries the information they need to know where they stand vis-a-vis the plan. Absolutely. And your position is that because all these other circuits have read it this way and what the statute says, maybe you have a different reading. It just is not, doesn't fall within the scope. No. My position is you have to give them everything that you need. And that's the summary plan description and the organic ERISA document that underlies it, which is the rights and obligations. If you happen, by the way, to have another document out there that has more stuff that isn't in the document under the plan. And that can happen. That's maundering. That can happen to administrative services agreement. But as a general principle, because there's no stop to this, right? There's probably emails. There's probably other side agreements. There's back and forth. There are amendments. Are all of these organizing plan documents? No. And to your point about, Your Honor, what does Congress want?  Right? We want to make this efficient. That's why we see all these efficiencies in ERISA. No jury trial. No discovery. Because we want it quick, clear, and efficient. To get people the benefits they need and to encourage employers to be able to administer their benefits under our employer-based system, which we have. This is how we do it. And we can only do that if we have clear rules that are actually functional. And what you're being asked to do here is decide that something that has no function, no benefit, no meaning to a member, nothing. And, in fact, it's not even in this record, so we don't even know what it says in this particular case, is totally the antithesis of that statute and of ERISA. And you have nothing to worry about as a court of not giving people the information you need because your ruling is give them everything they need to adjudicate their claim. Give them everything. And this goes to the second issue of the medical policies. Everything that you looked at in deciding that they weren't entitled to a claim. And make sure that you get those things to them. And that is how ERISA should work. What we don't. Stop. We are not being asked to do any of that. We're being asked to interpret the disclosure statute. And what does it mean? Right. And most of those cases that you're talking about are not disclosure statute cases. They're trying to decide whether the ASA is a plan document. That is not the same question. We are being asked to interpret the disclosure. The disclosure statute, which is what the Seventh Circuit did in the Madden case. Yeah. So I want to be clear. All these things that you say that this is what they need. This is what that member needs. That's not our question. Our question is what does a disclosure statute require? That's the only question we have. And the disclosure statute is pretty clear that it's requiring those things that are the functional plan documents. And that also happens to be what they need. And that's why the statute says what it says. And I think those cases are disclosure. I think we get your gist. Okay. Thank you. Thank you. Mr. King. I'm sorry to tell you, but she's up to 30 minutes. No time for you to argue. Well, sometimes that's the way it goes. May it please the Court. Brian King for the plaintiffs, the appellees in this case. I think for purposes of keeping on the same track, I'm going to take up that last point about the disclosure requirements. And I don't have a lot to say because I think the Court has it well in hand. Other than I think the language of the statute that we're talking about, 29 U.S.C. Section 1024B-4, really is dispositive. As you said, Judge Moritz, and yourself, Judge Rossman, have reiterated. It says the administrator shall, upon written request of any participant or beneficiary, furnish a copy of the latest updated summary plan description and the latest annual report or terminal report, the bargaining agreement, trust agreement, contract, or other instruments under which the plan is established or operated. Not just established, but operated. So it contemplates not just the foundational documents, which of course are critical. We can all understand why. It contemplates the availability of documents upon request to any participant or beneficiary that involve how the plan on a day-to-day basis is operated, at the very least for the time in question for the benefits at issue. Those are the kinds of things that the language of the statute specifically asks for. And it's not just the contracts. I think it's important to note there are at least two documents in here that are specified and identified by Congress that are purely informational. They don't in and of themselves establish any rights and obligations between the parties. One of them is the latest annual report, and there's a reference to any terminal report. Now, why is that important? Because it shows, as you're pointing out, Judge Moritz, that this is an informational requirement. This is a disclosure requirement of basic information that's necessary for individuals to understand how and why their claim is being handled the way it is. It's not just narrowly focused on documents that specifically establish rights and obligations between the parties. Do you think it includes the payment arrangements between the employer and the administrator? Tells them how their fee is based? I appreciate that question, Judge Hartz, because I think it's insightful that there may be things. The answer to your question is I think there may be things in an administrative services agreement that are financially sensitive, even proprietary, that a plan fiduciary, the plan administrator, the claims administrator may very well say, you know what, we're going to produce the document, but we're redacting some things out of it that you don't need to know about or that are proprietary. You don't think there needs to be any reason why a member of the plan would need this information before you can get the document? I'm focusing on the circuit decisions that employees, just in generous, and I apologize if I'm not pronouncing that correctly, to limit the catch-all terms at the end of the list in the section of the statute. And they say it should be like the others. And the others, whatever the scope of that is, it's got to be like that. I think that it's... You disagree with that form of analysis? In concept, I don't have a problem with it. But the practical application of that argument is that what you're doing is empowering plan administrators and claims administrators like Primera to take it upon themselves to substitute their own judgment for the judgment of a participant or beneficiary about what the participant or beneficiary need in order to understand the claim for benefits. And that's not what Congress contemplated in this information section. Well, it's going to be up to the court to look at the document and see if its contents are similar to these earlier documents, and maybe in part they are and that would be disclosed and other parts not. It's not clear to me that the courts that have restricted the meaning of the last terms are saying, and that's totally in the discretion of the plan administrator to decide whether the document is of that type or not. Well, I think that you're certainly going to find some documents that aren't specifically listed. This ASA is one of them. We believe it's clearly within the scope of contracts under which the plan is operated that should be disclosed. Other documents, it's a harder call. It's a closer call. Who makes that call? It's less clear. Well, I think initially the plan administrator and the claims administrator make that call. Subject to review by the court. Yes. And if they make the wrong call, they may find that a court says I'm going to assess statutory penalties against you because you failed to disclose something that you needed to disclose. So I don't have a problem with that. I recognize that these are fact-sensitive things in the sense that – Why shouldn't that be the test? Why shouldn't – Well, I think that practically – Why shouldn't the judge be applying that test? I think that practically is exactly what the test is, and that's why we're here today because we have a disagreement about whether the ASA falls, the administrative services agreement falls within that, the scope of that range. I think the Tenth Circuit advances the discussion, the case law on this issue, by ruling in this particular case, under these particular facts and circumstances, this particular document falls within the scope of Section 1024b-4, and it needs to be produced. Now, the next district and circuit court who decides it may very well say, well, under that circumstance – Isn't that what other courts have already done when they're saying it does or doesn't fit? They have. But I think that, as Judge Moritz has alluded to, they have ignored too quickly and too significantly the express and explicit language of the statute itself, because it's hard for me to understand how the administrative services agreement does not fall within – squarely fall within the scope of a contract under which the plan is operated, and that the disclosure of which can provide information to allow participants and beneficiaries to understand much more. I agree with you. I have concerns of just saying, well, it's a contract or other instrument under the plan, and so it has to be disclosed unless there's some trade secret. I think that's going to be – I think it would be more limited than that. There's going to be a case-by-case determination. Look, plan administrators and claims administrators are not quick to disclose any information or documents other than what they feel they absolutely have to. So this will be – this will continue to be litigated, and that's fine. We'll find district courts and circuit courts making decisions about what needs to be disclosed and what doesn't. We would simply submit the ASA in this case clearly and squarely falls within the language of the statute. Counsel, does whether the plan is divided or not divided, the administrational plan, how should we be thinking about that? No, I appreciate that, and I appreciate the point that you asked of my colleague, Judge Rossman, because Mondri, it was quite honestly astonishing to me that my colleague said that there are two plan administrators in this case. There are not two plan administrators in this case. The plan document, the summary plan description, clearly and explicitly designates only one plan administrator, and it is Microsoft. Why is that true? Because plan administrators carry – the designation of plan administrator carries with it significant liability that claims administrators don't have under the statute. This case is the perfect example of that. The district court made a ruling against Microsoft, rather, not Primera. It didn't say Primera was a co-plan administrator for purposes of assessing statutory penalties. In fact, there are not two plan administrators here. There is a one plan administrator. It's Microsoft. There's a claims administrator pursuant to the ASA, and that is Primera, and they do not have the same obligations that the plan administrator has under the statute. So in that sense, I don't think Mondry is distinguishable from the circumstances before this court. I want to mention one of the things that I think is critically important and that I was quite embarrassed, Your Honor, Your Honors, quite honestly, when I read our brief and I realized that we did not specifically include critical language from the Parity Act that talks about the availability of plan information. I'm moving now to the question about whether the criteria that we asked for, and that is specifically identified as being required to be produced under the regulatory, the final rules, 29 CFR Section 2590.712 per ND per N3. It's specifically designated under the final rules, but I think what's critically important is that 29 USC Section 1185A.A.4, the statute itself says under the heading availability of plan information, it makes clear that the medical necessity criteria for mental health and substance use disorders must be made available to any participant or beneficiary upon request. It does not specifically say that the analog medical necessity criteria, which we alleged was not produced to us upon request, does have to be produced. The final rules complete that, close that loop by saying that. But what's important, and I want to make sure that the Court understands, I think is critical, is to say that there is no question that these medical necessity criteria that deal with the medical surgical analog, whatever they are, we can, we talk, there's another issue about whether inpatient hospice are they analog proper or not. We think they are. You've heard the arguments on that. We'll get to that in a minute. But there's no question that the medical necessity criteria for skilled nursing facilities and inpatient rehabilitation facilities are subject to production under that final rule, that D3. We allege that they also, by, it was the proper authority, exercise of authority by the regulatory agency, it's common sense, it makes sense. If you're going to require the production of the medical necessity criteria for mental health and substance use disorders for purposes of the analysis of the Parity Act that this Court has to carry out and for that matter the plan has to carry out, you also have to have access to the corollary, the comparable, the other, these medical necessity criteria for the analogous level of med-surg care. And that's what we're talking about here. So that's why that has to be provided. Doesn't that, that D3 is a regulation implementing the Parity Act? It's a regulation. It's the final rule. To the Parity Act, yes. How does it, it seems to be entirely inconsistent with the language of the ERISA disclosure statute. I wouldn't. 1024. Help me understand that. Well, and I think that's the argument that's made in the defendant's reply brief, is that, you know, it says that instruments under which the plan is, the reg says instruments under which the plan is established are operated, include, and then it says basically it would include the interqual criteria. That's right. And that's what the district court found. The problem is that seems inconsistent with the language of B4, the statute itself, which tells us what we need to disclose, at least in this case, which is other instruments under which the plan is established or operated. That's different than what the regulation says. Isn't the regulation giving us an example of what instruments under which the plan is established or operated means for purposes of thinking about area? Certainly. Certainly. And keep in mind, Your Honors. But what I'm trying to say is, if the statute said unambiguous and doesn't include that type of instrument. Well, I don't think it's ambiguous. I agree with you, Your Honor, but I don't understand. But if it's not ambiguous, then what is the regulation? I don't understand, Judge Moritz, how the medical necessity criteria, the document that contains the medical necessity criteria is not a document under which the plan is operated. It is a document under which the plan is operated. Well, because of the word instrument. Oh, well, I think everybody who is. Or other instruments under which the plan is established or operated. I have not, Your Honor. And using our interpretation rules, that would be like a contract or any of these other documents that are legal instruments, and nobody suggests that the interqual criteria are legal documents. Okay, thank you. Or instruments. And so I'm suggesting, yeah, and it's complicated, but I don't think the district court, I don't think this argument was made to the district court. No, it wasn't. Thank you for helping me understand that. And I think they do make it in their reply brief, and it's a pretty strong argument. Well, here's what I would. I'd like you to address why that doesn't conflict, why the reg and its examples, and the reg, again, being under the Parity Act, doesn't refer back to this ERISA disclosure requirement. Here's what I would say about that. The word instruments, I think, is inherently ambiguous. Does it mean documents? Does it mean only the formal legal documents that are entitled to acknowledgment and understanding as formality, legal formality? I have interpreted and read cases that substitute day in and day out the word document for instruments. Now, if you do that, and I think it makes sense to do that, I think that the D3 medical necessity criteria that we're talking about fall comfortably within the scope of that. If what we're talking about is documents under which, or instruments, not formal legal instruments, but documents under which the plan is operated, we've got what we need there. I would just say this. I think the timing of these statutes is important, Your Honor. Obviously, 1024B4 was passed, as ERISA was passed, back in 1974. And MHPAEA, the Mental Health Parity Statute, didn't come along until 2008, and the final rules didn't come along until 2013. So to what extent, when we're talking about that language that I referred to before, 29 U.S.C. Section 1185A4, that talks about availability of plan information, to what extent does the Mental Health Parity Statute itself modify the disclosure requirements of ERISA? I would say there's a close relationship there that's important. And this is why the Duncan v. Jack Henry case, I know I'm over time, if I may have a moment to complete my thought on this, Your Honor. Judge Harden. You're entitled to more time. Well, my point was that a regulation can't modify. If the statute is clear, and we're supposed to use all the tools in our interpretive toolbox to find out whether the statute is clear, and we can't go on past that under Chevron. If the statute's clear, and using all those tools in the toolbox, why would we not define other instruments to mean legal instruments or contracts rather than broad-term documents? Let me address it in this way, Your Honor. And this is, I think, where the Duncan v. Jack Henry case, that was cited for the first time by either party in the reply memo, the reply brief from Primera, is an important case. And I read it carefully, and you've read it carefully, because you're asking questions that go to the heart of that. And the way in which one of the things that I thought was troublesome about that reply brief and the way the Duncan v. Jack Henry case was characterized by defense counsel was as if that disposes of this issue entirely. That is not accurate. Duncan v. Jack Henry dealt with something different. It said, the only inquiry before the court is whether plaintiff states a claim for statutory penalties regarding the plan administrator's alleged failure to provide the specific comparative analysis requested by plaintiff. That's different than the language of the mental health or the medical necessity criteria that we're talking about in this case. And the reason it's different is because A4 of the Mental Health Parity Statute talks about available plan information and makes specific reference, in the terms of the statute, to medical necessity criteria for mental health and substance use disorder. It makes no reference in the same way to comparative analysis being made available. It's not in A4. So that's how Duncan v. Jack Henry is distinguishable. I understand what you're saying, Your Honor, and I appreciate you clarifying your distinction, your mind, between instruments and other documents. But I think that when you look at what Congress intended in passing the Parity Act and the language of, quote, availability of plan information, unquote, section in Parity, which is 1185A, A4, that provides us with a significant indication of congressional intent that the disclosure requirements of a RISA plan for purposes of parity be expanded to cover these kinds of medical necessity criteria. That's all I'm going to say for now. Do you want to speak briefly about the merits of the Parity Act claim? I'm sorry, Your Honor? Do you want to speak briefly about the merits of the Parity Act claim? Yes, yes. Well, I just think that it ties into the standing or, yes, the standing issue a little bit in the sense that what Primera wants to do is bootstrap their way into a standing argument saying there's no standing by looking at the ultimate ruling of the district court as to whether there is a remedy available. We believe the district court got it right when the district court said there is a disparity when you have circumstances where only the plan language applies to access some types of intermediate-level medical and surgical treatment, as is the case for inpatient hospice, but you add not just the plan language, but five pages of single-spaced criteria that have to be met in order to find coverage for residential treatment. We believe that's a disparity on its face. You asked in your questions, Judge Rossman, is this facial or is it applied? The answer is yes. You can have both. We believe both exist here. Did you allege both? I don't know that I can tell you off the top of my head whether the complaint and whether our motions for summary judgment talked about them both specifically, but I can tell you this, Your Honor. When you have a disparity between the medical necessity criteria, whether it's in the language of the plan itself or in the language of the medical necessity criteria that's utilized to interpret the terms of the plan, this court has said, and I don't think we cited this in the briefing, but the Jones v. Kodak case from back in 1999 is a case where this court said the medical necessity criteria is a term of the plan and we are not free to ignore or alter those criteria. I know that because it was a bitter loss for me before this court, but that's what this circuit has said. So you read the district court's ruling as a ruling on a facial parity claim? Yes, to the extent that the court is saying on its face there are more rigorous requirements for the medical necessity of residential treatment and coverage for residential treatment than exists for analogous levels of inpatient hospice. The last thing I would say, and I know I'm way over time, but you asked Judge Hartz about that question about the merits of the mental health parity claim. I would simply say what you've got is Premier and Microsoft and the plan here insisting on ignoring the statutory analytical framework. I shouldn't say statutory. The analytical framework that is put in place by the final rules that say whenever you have a type of care, a benefit that's provided for a type of care under the plan, you have to slot it in to one of these six categories for purposes of a parity analysis. There's no discretion afforded to say, well, some stuff doesn't really fit. And this has been addressed numerous times by the regulatory tri-departments, they call them, the Departments of Labor, Department of Health and Human Services, and Department of the Treasury are the three departments who are responsible for coming up with the final rules under parity. And they have said more than once, you've got to categorize any benefits that you provide into one of these six categories. Some people said, I had Judge Jenkins down in the district court in Utah say, this makes no sense to me. I just don't even buy the idea that you can do this. I get it. It's awkward. It doesn't really even make sense in some ways. But the reality is despite significant qualitative differences between hospice treatment and residential treatment for mental health and substance use disorders, which we acknowledge exist, they nevertheless, under the final rules, have to be put in their proper category. And that's the basis for an analysis and the framework for an analysis under the parity statute. And that's unless the court has other questions. That's all I have. Thank you, counsel. Thank you. We've gone so far over. But I'd generally like to give a moment of rebuttal. If there's something specific he said you want to dispute, don't repeat. We know your position quite well. If there's one thing you need to dispute, I want to dispute about what he said. Two things. And they'll be really fast. Really fast. OK. The interqual criteria gives guidance. They are guidelines on how to interpret medical necessity as defined in the plan language. And it is not an additional requirement. As the district court itself found when he said that when the court found that it's not medically necessary with or without. It is merely providing, and there are a number of cases that so find, that this doesn't add an additional thing. It helps you interpret medical necessity with any particular modality, whether it's skilled nursing, residential treatment. And the next issue is if Congress, and I'll keep it in one sentence, if Congress had said we want every document, to produce every document that is relevant to the plan, it would have so said. Thank you. Well, thank you. Keeps us thinking. If we're capable of it. I think two of us are. I'm not sure about myself. Cases submitted, counsel excused. Courts in recess.